2UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MIKE YODER, *et al.*,<br>    Plaintiffs,<br><br>v.<br><br>SCOTT BOWEN, IN HIS OFFICIAL CAPACITY<br>AS DIRECTOR OF THE MICHIGAN<br>DEPARTMENT OF NATURAL RESOURCES<br>    Defendant. | No. 1:23-cv-796<br><br>Honorable Paul L. Maloney |

## ORDER RESOLVING MOTION TO DISMISS

This matter comes before the court on Defendant's motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 24). Plaintiffs filed a response in opposition, (ECF No. 26) and Defendant filed a reply brief. (ECF No. 27). The court will grant the motion.

### I. Background

Mike Yoder owns and operates Drone Deer Recovery ("DDR"), an Ohio LLC. Mr. Yoder and his company assist hunters and locate downed game using drones. Mr. Yoder wants to expand his business to Michigan. Jeremy Funke is a Michigan resident and hunter who would like to use DDR's services. Mr. Bowen is the Director of the Michigan Department of Natural Resources ("DNR"). DNR officials assert that DDR's services would violate Michigan law. Plaintiffs allege that the DNR is violating their First Amendment Right to freedom of speech. (ECF No. 23).

In this as applied challenge, Plaintiffs seek a permanent injunction restraining the DNR and its agents from enforcing M.C.L. § 324.40111c against them. The relevant statute, referred to as the "Drone Statute," states the following:

> An individual shall not take game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight or using an unmanned vehicle or unmanned device that operates on the surface of water or underwater.

M.C.L. § 324.40111c(2). The Michigan Legislature defines "take" as "to hunt with any weapon, dog, raptor, or other wild or domestic animal trained for that purpose; kill; chase; follow; harass; harm; pursue; shoot; rob; trap; capture; or collect animals, or to attempt to engage in such an activity." M.C.L. § 324.40104(1).

In Michigan, some hunters spend countless hours preparing for hunting season. They plant food plots, build blinds, install motion cameras, and clear brush for shooting lanes. Come fall, hunters fill the forests and fields. Some hunters are lucky enough to harvest a deer and fill their tags, others are not. Perhaps some of the unluckiest are those who wound a deer but never find it in the woods. In comes DDR.

DDR uses unmanned aerial vehicles, or drones, to find downed game. DDR's drones use infrared cameras and thermal imagery to track deer and their heat signatures. Once found, the DDR pilot marks the location of the deer for the hunter. Per the first amended complaint, DDR receives frequent requests for deer recovery services in Michigan but is forced to reject them for fear of the DNR, which advised them that DDR's services would be illegal in Michigan. DNR interprets "use" to include "locate." Thus, when a drone locates an animal's carcass after it has been downed by a hunter, the drone is being "used" to

"collect" that animal, allegedly in violation of M.C.L. § 324.40111c(2). The collection of an animal's carcass is defined as a taking under Michigan law. M.C.L. § 324.40104(1).

The first amended complaint alleges that the DNR's interpretation of the Michigan's Drone Statute, M.C.L. § 324.40111c(2), is a content-based restriction on speech "because it singles out a particular type of speech, namely location information pertaining to downed game, and prohibits its creation and dissemination if it will be used to collect the game." (ECF No. 23 at PID 91). The DNR moved to dismiss the complaint.

## II. Legal Standard

To survive a motion to dismiss under 12(b)(1), a plaintiff must show Article III standing. *Davis v. Detroit Pub. Sch. Cmty. Dist.*, F. App'x 18, 22–23 (6th Cir. 2020). At this stage, the court "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Parsons v. U.S. Dep't. of Justice*, 801 F.3d 701, 710 (6th Cir. 2015). To establish standing, a plaintiff must show (1) an actual or imminent injury in fact; (2) a causal connection between the injury and the defendant; and (3) that the injury is redressable by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). To survive a motion to dismiss, a plaintiff must allege facts sufficient to state a claim for relief that is "plausible on its face" and, when accepted as true, are sufficient to "raise a right to relief above the speculative level." *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (citation omitted). "The complaint must 'contain either direct

or inferential allegations respecting all material elements necessary for recovery under a viable legal theory.'" *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015) (citation omitted). To resolve a motion to dismiss, a court must accept as true all factual allegations, but it need not accept any legal conclusions. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011).

### III. Analysis

The DNR moved to dismiss on three grounds: a lack of jurisdiction, Eleventh Amendment immunity,[1] and because Plaintiffs failed to state a claim. When reviewing the complaint, conduct alleged can best be divided into halves. First, a drone operator uses a drone to find wounded game. Second, the drone operator relays that information to the hunter.

### A.

The DNR argues that Plaintiffs lack standing because they did not plead an ongoing harm of a constitutional nature. In the DNR's view, the complaint alleges that Plaintiffs have a right to tell someone that they located deer using a drone, but locating a deer with a drone is not the activity Plaintiffs allege is protected by the Constitution. The DNR bifurcates the acts alleged in the complaint: flying the drone to track the deer and then telling the hunter where the deer is located. Said another way, enforcing the Drone Statute against Plaintiffs would only prohibit the tracking of the deer with a drone, not any speech that followed. For example, if Mr. Yoder were to shoot a deer, track it with his drone, and tell no one, he would

---

[1] Because other arguments dispose of this matter, the court will not address this argument.

4

still be in violation of the Drone Statute. In the DNR's view, it is not the speech that is being regulated, but just the act of flying the drone.

The complaint seeks a "permanent injunction restraining Defendant and Defendant's officers, agents, affiliates, servants, successors, employees, and all other persons in active concert or participation with Defendant from enforcing Mich. Comp. Laws § 324.40111c against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information." (ECF No. 23 at PID 93). The DNR argues that even if the court were to grant Plaintiffs' request, tracking wounded game with a drone would nonetheless remain illegal, leaving no redress for Plaintiffs. Plaintiffs do not require a drone for the "creation, dissemination, and receipt of certain information."

In response, Mr. Yoder argues he "wants to communicate the pinpoint location of downed game based on information he gathers from his drones, and Mr. Funke wants to receive that communication." (ECF No. 26 at PID 135). Mr. Yoder characterizes his drone flying as the "creation and dissemination" of information. Mr. Yoder then cites to some cases indicating that recording and filming is protected speech. *See, e.g., Kaplan v. California*, 413 U.S. 115, 119 (1973) ("The Court has applied similarly conceived First Amendment standards to moving pictures, to photographs, and to words in books."). Mr. Yoder also insists that the processes required for public expression are also protected by the First Amendment. *See, e.g., Fields v. City of Phila.*, 862 F.3d 353, 358 (3d Cir. 2017) ("The First Amendment protects actual photos, videos, and recordings . . . and for this protection to have meaning the Amendment must also protect the act of creating that material.").

The court finds that Plaintiffs lack standing to challenge this provision. Plaintiff's conduct can best be separated into two elements: flying a drone to track downed game (illegal and regulated) and relaying the location of the game to patron hunters (legal and unregulated). The Drone Statute prohibits an individual from "tak[ing] game or fish using [a drone]." M.C.L. § 324.40111c(2). Nothing in the Drone Statute contemplates speech or its regulation.[2] The DNR's interpretation of the statute as applied to Plaintiffs only bars the conduct of using the drone as contemplated in the Drone Statute. The Drone Statute does not regulate Plaintiffs' ability to send and receive information regarding downed game. Plaintiffs are free to track downed deer in a different manner and relay their findings. Plaintiffs' ability to relay the location information is not regulated by the Drone Statute, just flying the drone.

While this argument overlaps with the analysis below, the court is persuaded by the DNR's redressability argument. Redressability requires that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (citing *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 38 (1976)). Even if the court were to enjoin "Defendant from enforcing Mich. Comp. Laws § 324.40111c against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information," flying a drone to locate downed game would still be prohibited. Therefore, Plaintiffs lack standing.

---

[2] Plaintiffs' brief acknowledges the same: "Nothing in the text of the Drone Statute prohibits the flying of drones in general, or the gathering and transmission of location information." (ECF No. 26 at PID 132).

B.

The DNR moved to dismiss because the Drone Statute regulates conduct, not speech. The threshold question for First Amendment claims like those here is whether the challenged provision regulates protected speech. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968) (rejecting a "limitless" definition of protected speech). "Inherently expressive" conduct has been afforded protection under the First Amendment. *See Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 66 (2006). A speaker cannot avoid government regulations simply by explaining the conduct and demanding the protection of the First Amendment. *Id.* ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

To frame this inquiry, the court returns to the breakdown of Plaintiffs' conduct into two steps. The first is flying the drone and tracking downed game, and the second consists of disseminating that information to the hunter. As the court concluded above, the Drone Statute does not regulate the second step of the process—relaying the location of the downed game. What's left, then, is whether flying the drone, and scanning the wilderness "with a powerful long-zoom, infrared camera, thermal imaging technology" constitutes speech. (ECF No. 23 at PID 88). Plaintiffs insist they are creating information, which is entitled to First Amendment protection.

Drone usage is relatively new in the free speech arena, but the Fifth Circuit addressed a similar issue in *National Press Photographers Association v. McCraw*, 90 F.4th 770 (5th Cir. 2024). The court addressed whether no fly provisions violated the First Amendment

7

and concluded that they did not. *McCraw*, 90 F.4th at 787. The relevant Texas statute made it unlawful to "fly a drone under 400 feet above a correctional facility, detention facility, critical infrastructure facility, or sports venue, subject to a number of exceptions. *Id.* A group of journalists sued and argued that the no-fly provision regulated speech because their drones were often used for photography. *Id.* The court cited the following from the Supreme Court:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information.

*Id.* at 787 (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). The court concluded on this point, "the No-Fly provisions have nothing to do with speech or even expressive activity . . . they do not implicate the First Amendment." *McCraw*, 90 F.4th at 788.

Plaintiffs reject the distinction between flying a drone and relaying the location of downed game to a hunter. Plaintiffs argue that because Mr. Yoder "depends on a drone to create and convey speech," the Drone Statute "abridges Mr. Yoder's speech activity by restricting his use of drones." (ECF No. 26 a PID 140). In support of their position, Plaintiffs rely on select quotes from *Lichtenstein v. Hargett*, 83 F.4th 575 (6th Cir. 2023). *Lichtenstein* concerned a Tennessee law that made it a crime for anyone other than election officials to distribute the official form used to apply to vote absentee. 83 F.4th at 585. Ultimately, the court held that the law did not violate the plaintiff's First Amendment free speech rights for reasons inapplicable here, *Id.* at 583, but in dicta, the court mused about what could impede and implicate speech. The court explained that the "government might restrict the 'inputs'

8

that speakers use to express a message." *Id* at 585. The court explained that if the government "banned the sale of ink for the use in political pamphlets, it ostensibly would be regulating conduct—the sale of a commodity. . . but the Court would rigorously review this law because it targets certain speakers by burdening the written words for which they will use the ink."

On this point, the court disagrees with Plaintiffs. Tracking downed game does not depend on the use of a drone; hunters can find game through other means. Likewise, relaying the location of downed game is not regulated by the Drone Statute. A statute that makes it more difficult to gather information, or cuts off one approach, does not automatically implicate the protections of the First Amendment. *Zemel*, 381 U.S. at 17. Additionally, the dicta example from *Lichtenstein* is not analogous to this action. In the Sixth Circuit's example, a government passed a law which ultimately restricted certain speakers—those creating political pamphlets—and banned the sale of ink, which was necessary to create those pamphlets. In this instance, Michigan passed a drone usage law designed to protect the resource and hunters alike in a manner directed at conduct. Further, drones are not the typical "inputs" that society relies on for speech, unlike the written or spoken word. The Drone Statute does not regulate speech.

Finally, Plaintiffs' attempt to distinguish *McCraw* fails. Plaintiffs argue that the no-fly law restricted *where* individuals could fly and that the Drone Statute restricts what an individual may do with a drone. But either way, both laws restrict what is observable by the drone. The Texas law at issue in *McCraw* prevented journalists from using a drone near sensitive areas, which necessarily limited what they could do and view with drones.

9

## IV. Conclusion

The court finds that Plaintiffs lack standing and fail to state a claim under Federal Rule of Civil Procedure 12(b)(6). In short, flying a drone for game tracking purposes does not implicate the First Amendment's protection of speech, and M.C.L. § 324.40111c(2) does not prevent an individual from relaying location information to hunters.

**IT IS HEREBY ORDERED** that Defendant's motion to dismiss (ECF No. 24) is **GRANTED.**

**IT IS SO ORDERED.**

Date: June 18, 2024         /s/ Paul L. Maloney
                            Paul L. Maloney
                            United States District Judge